**JUDGMENT ENTERED AUGUST 16, 2024**

No. 23-1173

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

--------

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION and UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondents*.

--------

On Petition for Review of a Final Rule
of the Department of Transportation

--------

**UNOPPOSED PETITION FOR PANEL REHEARING**

--------

CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Interstate Natural Gas
Association of America*

October 15, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

GLOSSARY ............................................................................................iv

INTRODUCTION ................................................................................... 1

BACKGROUND ..................................................................................... 3

REASONS REHEARING SHOULD BE GRANTED .............................. 8

    THE COURT SHOULD GRANT PANEL REHEARING TO
    ORDER REMAND OF SECTION 192.712(c) WITHOUT
    VACATUR SO THAT OPERATORS ARE NOT LEFT IN A
    WORSE POSITION THAN WHEN PHMSA'S UNLAWFUL
    SAFETY-FACTOR-FIVE STANDARD WAS IN EFFECT ....................... 8

CONCLUSION ......................................................................................13

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)..................................................................11

*American Bankers Ass'n v. National Credit Union Admin.*,
   934 F.3d 649 (D.C. Cir. 2019)..................................................................11

\* *Fertilizer Inst. v. EPA*,
   935 F.2d 1303 (D.C. Cir. 1991)...........................................................10, 11, 12

*GPA Midstream Ass'n v. Department of Transportation*,
   67 F.4th 1188 (D.C. Cir. 2023)..................................................................5

\* *North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008)..................................................................1

REGULATIONS:

49 C.F.R. § 192.712(c).........................................................1, 3-6, 8-10, 12, 13

49 C.F.R. § 192.712(c)(9)..................................................................4, 8

49 C.F.R. § 192.714(d) ..................................................................5, 9

49 C.F.R. § 192.714(d)(1)(ii)..................................................................3, 4

49 C.F.R. § 192.714(d)(2)(i)-(iii)..................................................................2, 3, 4

49 C.F.R. § 192.933(d) ..................................................................5, 9

49 C.F.R. § 192.933(d)(1)(ii)..................................................................3, 4

49 C.F.R. § 192.933(d)(2)(i)-(iii)..................................................................2, 3, 4

49 C.F.R. § 192.933(d)(3)(iii) (2003) ..................................................................4

88 Fed. Reg. 50,056 (Aug. 1, 2023)..................................................................5

[*] Authorities upon which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES—Continued

Page

**RULE:**

Fed. R. App. P. 40(a)(2)................................................................................8

**GLOSSARY**

INGAA:              Interstate Natural Gas Association of America

PHMSA:              Pipeline Hazardous Materials Safety Administration

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

No. 23-1173

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,

*Petitioner*,

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION and UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondents*.

On Petition for Review of a Final Rule
of the Department of Transportation

## UNOPPOSED PETITION FOR PANEL REHEARING

### INTRODUCTION

Petitioner Interstate Natural Gas Association of America (INGAA) respectfully petitions for panel rehearing for the limited purpose of altering this Court's vacatur of 49 C.F.R. § 192.712(c)—the so-called safety-factor-five standard—to remand without vacatur. *See North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam) (granting remand without vacatur on panel rehearing). To be sure, this is an unusual panel-rehearing petition in that it is the

successful petitioner—not the agency or a respondent-intervenor—that is requesting a remand-only remedy. But this is an unusual circumstance. Since the Court's judgment, INGAA has been made aware by its members and by non-party trade associations that the Pipeline Hazardous Materials Safety Administration (PHMSA) may implement this Court's mandate in a way that completely eliminates operators' ability to use engineering analyses to defer immediate or near-term[1] repairs of dents in pipelines, even ones that would not have to be immediately repaired or repaired in the near term under the safety factor of five this Court found arbitrary and capricious. Those unnecessary repairs will, in turn, disturb landowners, risk environmental impacts, divert limited agency and safety resources away from more-pressing risks, and impose millions of dollars in costs on operators—all for no good reason.

That benefits no one. Although INGAA believes that PHMSA can and should implement this Court's vacatur in a way that continues to allow industry-standard engineering analyses when assessing the need for dent repair, INGAA also has no interest in another year or more of follow-on litigation regarding how PHMSA implements the vacatur called for by this Court's opinion. The best

---

[1] "Near-term" is used to indicate a one-year repair condition for High Consequence Areas—areas with the greatest population—under 49 C.F.R. § 192.933(d)(2)(i)-(iii) and two-year repair condition outside of High Consequence Areas under 49 C.F.R. § 192.714(d)(2)(i)-(iii).

approach is for the Court to allow operators to comply with the safety-factor-five standard contained in the standard this Court vacated until PHMSA promulgates a new standard on remand. And it is an approach consistent with this Court's precedent and common sense.

Panel rehearing is particularly appropriate because PHMSA does not oppose it. We have consulted with PHMSA's counsel, who has advised us that although PHMSA believes that the Court did not err in its remedial analysis, the agency does not oppose remand without vacatur so that operators can continue to utilize the existing exemption for their immediate and near-term dent repair obligations found in 49 C.F.R. § 192.712(c) as issued until the agency can finalize its approach on remand.

The Court should grant panel rehearing to the extent of remanding without vacatur—rather than vacating—Section 192.712(c).

## BACKGROUND

**The Safety-Factor-Five Standard and Section 192.712(c).** PHMSA regulates whether and how quickly operators must repair dents detected in their pipelines. *See* Op. 12. Depending on the type of dent, where it is located on the pipe, and whether the pipe is located in a high consequence area, operators must repair a dent immediately or in the near term. 49 C.F.R. §§ 192.714(d)(1)(ii), (d)(2)(i)-(iii); *id.* § 192.933(d)(1)(ii), (d)(2)(i)-(iii).

These repair timeframes contain an exception, however.  Under the Final Rule at issue in this case, an operator can defer repairing a dent if "engineering analyses performed in accordance with § 192.712(c) demonstrate critical strain levels are not exceeded."  49 C.F.R. § 192.933(d)(1)(ii), (d)(2)(i)-(iii); *id.* § 192.714(d)(1)(ii), (d)(2)(i)-(iii).  Section 192.712(c) was also added by the Final Rule and prescribes a ten-step process for operators' dent-related critical engineering assessments.  *Id.* § 192.712(c).  But critical engineering analyses writ large were not new to the Final Rule.  The Final Rule built on PHMSA's previous regulations, which allowed operators to monitor, rather than repair, dents on the upper two-thirds of a pipe with a depth greater than 6 percent of the pipeline diameter where "engineering analyses of the dent demonstrate critical strain levels are not exceeded."  *Id.* § 192.933(d)(3)(iii) (2003).

Section 192.712(c)(9) as promulgated in the Final Rule calls for operators to use a safety factor—which "provide[s] a margin of error to ensure that the dent is reassessed prior to failure," Op. 13—of five in conducting their critical engineering analyses.  49 C.F.R. § 192.712(c)(9).  On INGAA's petition for review, the Court agreed with INGAA that PHMSA did not comply with the Pipeline Safety Act in selecting the safety factor of five because the Final Rule did "little to explain why the agency adopted the top end of the range" of potential safety factors found in the

4

engineering literature "and, more importantly, d[id] nothing to identify the *costs* of the standard." Op. 14.

But the Court concluded that it could not vacate Section 192.712(c)(9) alone. Op. 14-15. The Court instead held that it had to vacate all of Section 192.712(c) because the Court had "'substantial doubt that the agency would have adopted' the [critical engineering analysis] exception without the reassessment-interval requirement in subsection (c)(9)." *Id.* (citation omitted).

**Uncertainty regarding PHMSA's implementation of Section 192.712(c)'s vacatur leaves operators without guidance and potentially harmed.** With the Court's decision to vacate all of Section 192.712(c), it falls to PHMSA to decide how the vacatur will be implemented. *See*, *e.g.*, 88 Fed. Reg. 50,056 (Aug. 1, 2023) (PHMSA technical corrections implementing this Court's decision in *GPA Midstream Ass'n v. Department of Transportation*, 67 F.4th 1188 (D.C. Cir. 2023)). One step is easy: PHMSA will strike Section 192.712(c) from the *Code of Federal Regulations*. But the question remains just how PHMSA will edit Sections 192.933(d) and 192.714(d), which cross reference Section 192.712(c).

PHMSA could take two approaches. Industry has urged PHMSA to strike just the words "in accordance with § 192.712(c)," which would allow operators to use engineering analyses to demonstrate critical strain levels are not exceeded—

5

meaning the pipeline can be safely operated—and defer repair, an approach PHMSA authorized as recently as 2022. A34 (post-judgment letter from non-parties the American Gas Association and American Petroleum Institute advocating this approach). But there is a risk that PHMSA could strike the entire phrase "engineering analyses performed in accordance with § 192.712(c) demonstrate critical strain levels are not exceeded," meaning that operators would need to repair immediately or in the near term *any* covered dent, even those covered dents that industry-standard engineering analyses show are not at risk of failure.[2]

Requiring operators to repair immediately or in the near-term dents of this sort would impose significant burdens on both operators and communities. If an operator discovers an immediate-repair condition—even one that is perfectly safe under accepted engineering analyses—the operator "will need to either reduce gas throughput or completely stop gas throughput on the section of the pipeline near the repair, even during high-demand periods when homes and businesses are most

---

[2] INGAA does not believe that a PHMSA implementation that strikes the phrase "engineering analyses performed in accordance with § 192.712(c) demonstrate critical strain levels are not exceeded" would be consistent with this Court's mandate or lawful under the Pipeline Safety Act and reserves its rights with respect to any technical amendments that PHMSA might issue. But if the Court grants this petition, INGAA's concerns with the implementation of Section 192.712(c)'s vacatur will be resolved because operators will be able to follow Section 192.712(c) until PHMSA acts on remand.

reliant on natural gas to heat or air condition their homes or when utilities count on natural gas to generate electricity to meet peak demand." Kochman Decl. ¶ 17. And in the absence of some engineering-analysis exception, the number of dents that must be excavated will increase dramatically. *Id.* ¶ 18. Under regulatory reforms not challenged in this case, operators must search for dents with metal loss on approximately 180,000 miles of pipe, which is 13 times the mileage that had been required prior to those additions. *Id.* ¶ 15. A sampling of INGAA members has estimated that these members will collectively need to perform up to 572 digs a year, costing nearly $85.8 million, to repair dents without an engineering-critical-analysis exception. *Id.* ¶ 18. As the American Gas Association and American Petroleum Institute have explained, "elect[ing] to disallow 'engineering analyses' in general . . . would create considerable difficulty in thoughtfully prioritizing repairs and maintain[ing] gas deliverability, with little if any benefit to public safety as operators expend additional resources to making repairs on piping that can be shown (through engineering analysis) to not be a threat." A34.

The additional digs will disturb rights-of-way and inconvenience landowners and their neighbors on or near the rights-of-way in the form of increased truck traffic and noise during repairs—potentially damaging operator-landowner relations. Kochman Decl. ¶ 19. The repair work could also disturb wildlife, vegetation, and plants and potentially impact waterbodies and fisheries for pipeline

segments that are under or through waterbodies. *Id.* ¶ 20. And for some small minority of repairs, the lack of an engineering-analysis exception could lead to additional methane emissions. *Id.* ¶ 21.

INGAA has attempted to discern from PHMSA how, exactly, it plans to implement this Court's vacatur. Kochman Decl. ¶ 10. After all, operators must know what their obligations are on the day that this Court's mandate issues. But PHMSA has declined to say. *Id.* Without guidance from PHMSA, INGAA, its members, and non-INGAA-member operators have been forced to plan for implementation of vacatur that would leave them with no engineering-analysis-based way to avoid unnecessary repair of dents at no substantial risk of failure.

This petition follows.

## REASONS REHEARING SHOULD BE GRANTED

**THE COURT SHOULD GRANT PANEL REHEARING TO ORDER REMAND OF SECTION 192.712(c) WITHOUT VACATUR SO THAT OPERATORS ARE NOT LEFT IN A WORSE POSITION THAN WHEN PHMSA'S UNLAWFUL SAFETY-FACTOR-FIVE STANDARD WAS IN EFFECT.**

This Court will grant panel rehearing when there are matters that have been "overlooked or misapprehended." Fed. R. App. P. 40(a)(2). The Court and the parties here discussed the vacatur of Section 712(c) versus Section 712(c)(9), but did not discuss the impact that the vacatur of Section 712(c) would have

downstream on Sections 192.933(d) and 192.714(d)'s provisions regarding dent repairs.

If PHMSA were to implement this Court's vacatur by striking the full phrase "engineering analyses performed in accordance with § 192.712(c) demonstrate critical strain levels are not exceeded" in Sections 192.933(d) and 192.714(d), that would require operators—including operators that were not before this Court when the judgment issued—to repair covered dents immediately or in the near term. And those repairs would be required even if an engineering analysis conducted in accordance with Section 192.712(c) and its safety factor of five would demonstrate that the dent poses no safety risk to the public.

That result will leave operators and the public worse off than if INGAA had not prevailed. As the American Gas Association and American Petroleum Institute explained in a post-judgment letter to PHMSA, if PHMSA decided to disallow engineering analyses in general, "[o]perators may end up excavating and repairing all dents with metal loss," which "could result in otherwise unnecessary methane emissions" and "[e]xcavations [that] could result in disruption to landowners, as well as impairing gas deliverability." A34. In addition, "[o]perators could be disincentivized from investing in the most advanced [in-line inspection] technologies that help pinpoint dents with metal loss" and "[o]perators could be forced to spend hundreds of millions of dollars on repairs for anomalies

representing minimal risks to pipeline safety, taking away resources from higher safety priorities." *Id.*

INGAA's members have reported similar concerns post-judgment. INGAA surveyed its members to see the impact of repairing dents with metal loss without an engineering-critical-analysis exception and responding members estimated that they collectively will need to perform up to 572 digs a year, costing nearly $85.8 million, to repair. Kochman Decl. ¶ 18. And the harm of these excavations is much more than the monetary costs to operators. The digs will disturb rights-of-way, inconvenience landowners and their neighbors, harm the operator's relationships with landowners, and potentially create environmental risks. *Id.* ¶¶ 19-21. And INGAA's policy experts confirm that these digs will force operators to prioritize repairs to pipeline segments not at any material risk of failing—even under PHMSA's existing regulations—drawing away PHMSA and operator safety resources from more-substantial risks. *Id.* ¶¶ 14, 17, 22.

Under the circumstances, the Court should grant panel rehearing to alter its judgment to remand Section 712(c) without vacatur. Remand without vacatur is appropriate because "when equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991). Generally speaking, the remand-without-vacatur analysis considers "(1) the seriousness of the

deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (citation omitted).  In this analysis, "[a] strong showing of one factor may obviate the need to find a similar showing of the other." *Id.*; *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993) (determining that, because vacatur would give regulated parties a "peculiar windfall," the small chance of justifying the action was given "little weight" in the remedial analysis).

This is one of those cases.  INGAA does not believe that PHMSA can substantively justify a safety factor of five in a future rule.  But given the disruptive effects of vacatur explained above, remand without vacatur is appropriate so that operators are not worse off for having successfully challenged PHMSA's arbitrary action in promulgating a safety factor of five.

This Court has held that remand without vacatur is appropriate remedy in a case like this one.  Where the petitioner's "only complaint about the exemptions is that they are not broad enough"—INGAA, remember, argued that PHMSA should use a safety factor of two rather than five—this Court has ordered remand without vacatur so that an agency can dedicate its limited resources to safety threats significant enough to fall beyond the original exemption.  *Fertilizer Inst.*, 935 F.2d

at 1312. Similarly here, keeping the safety factor of five in place during remand proceedings ensures that operators' and PHMSA's necessarily limited resources are not expended on dents that have no reasonable chance of failing in the near future. But remand without vacatur protects operators' interests by "not relieving [PHMSA] of its burden" to comply with the Pipeline Safety Act and conduct a cost-benefit analysis of any safety factor it proposes "*ab initio*, *i.e.*, without giving preference to the exemptions left in place in the interim." *Id.*

Finally, remand without vacatur is appropriate because PHMSA does not oppose it. We have consulted with PHMSA's counsel—and although PHMSA believes that the Court did not err in its remedial analysis—PHMSA does not oppose remand without vacatur so that 49 C.F.R. § 192.712(c) as originally issued may remain in place while the agency on remand reconsiders the appropriate approach in accordance with this Court's opinion and applicable procedures. Where both the petitioner and the agency agree on the appropriate remedy—a remedy that PHMSA contemporaneously endorsed at oral argument, Oral Arg. Recording 14:41 ("I don't think we would resist the idea of remand without vacatur at least as to some of the provisions . . . .")—that is a strong sign that the remedy is one that the Court should employ.

## CONCLUSION

For the foregoing reasons, the Court should grant panel rehearing to the extent of remanding without vacatur—rather than vacating—Section 192.712(c).

Respectfully submitted,

/s/ Sean Marotta
CATHERINE E. STETSON
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Interstate Natural Gas Association of America*

Dated:  October 15, 2024

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App.

P. 40(b)(1) because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f), this document contains 2,574 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word in 14-point Times New Roman.

                                   /s/ Sean Marotta
                                   Sean Marotta

**ADDENDUM**

## TABLE OF CONTENTS

Page

Panel Opinion ................................................................................................ A1

Certificate as to Parties, Rulings, and Related Cases ........................................... A21

Declaration of Ben Kochman ................................................................................ A23

Exhibit A – AGA and API Letter to PHMSA ...................................................... A32

i

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 16, 2024               Decided August 16, 2024

No. 23-1173

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,
PETITIONER

v.

PIPELINE AND HAZARDOUS MATERIALS SAFETY
ADMINISTRATION AND UNITED STATES DEPARTMENT OF
TRANSPORTATION,
RESPONDENTS

———

On Petition for Review of a Final Rule
of the Department of Transportation

———

*Sean Marotta* argued the cause for petitioner.  With him
on the briefs were *Catherine E. Stetson*, *Matthew J. Higgins*,
and *Keenan Roarty*.

*Brian J. Springer*, Attorney, U.S. Department of Justice,
argued the cause for respondents.  With him on the brief were
*Brian M. Boynton*, Principal Deputy Assistant Attorney
General, *Abby C. Wright*, Attorney, *Paula Lee*, Senior Trial
Attorney, U.S. Department of Transportation, and *Jeremy T.
Henowitz*, Attorney, Pipeline and Hazardous Materials Safety
Administration.

**A1**

2

*Adrienne Y. Lee* and *Hana Vizcarra* were on the brief for *amicus curiae* Pipeline Safety Trust in support of respondents.

Before: WILKINS, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*:    The Pipeline and Hazardous Materials Safety Administration ("PHMSA") regulates the safety of pipelines that transport natural gas and other potentially dangerous materials.    In 2022, PHMSA promulgated a long list of new and revised safety standards. A trade group that represents pipeline companies — the Interstate Natural Gas Association of America ("INGAA") — challenges five of those standards, alleging flaws in the rulemaking process and inadequacies in PHMSA's final justifications.    With respect to four of the standards at issue, we agree with INGAA that the agency failed to adequately explain why the benefits of the final standards outweigh their costs, as required by 49 U.S.C. § 60102(b)(5).    But we conclude that the agency properly promulgated the last challenged standard.    We therefore grant the petition in part and deny it in part.

## I.

### A.

The Secretary of Transportation is required by statute to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities."    49 U.S.C. § 60102(a)(2).    The Secretary has delegated that authority to PHMSA.    *Id.* § 108(f); 49 C.F.R. § 1.97(a)(1).

3

When prescribing pipeline-safety standards, PHMSA must follow certain procedures that are mandated by statute. The procedures "are more specific and still more demanding" than those required by the Administrative Procedure Act ("APA"), which PHMSA also must follow. *GPA Midstream Ass'n v. Dep't of Transp.*, 67 F.4th 1188, 1196–97 (D.C. Cir. 2023).

To impose a new standard, PHMSA must publish two cost-benefit analyses: one when it first proposes the standard, and another when it finalizes the rule. *See GPA Midstream*, 67 F.4th at 1197–98, 1200–01. The first cost-benefit analysis is part of the required "risk assessment," 49 U.S.C. § 60102(b)(3), which the agency submits to "an advisory committee of experts for peer review, and to the public for comment."[1]  *GPA Midstream*, 67 F.4th at 1192 (citing 49 U.S.C. § 60102(b)(4)). The advisory committee then provides a report on the proposed standard, which recommends adopting, rejecting, or changing it. *See* 49 U.S.C. § 60115(c)(2). Before finalizing the rule, PHMSA must consider the advisory committee's recommendation; "comments and information received from the public"; and other factors, such as the "reasonableness of the standard." *Id.* § 60102(b)(2). In addition, PHMSA must again explicitly consider costs and benefits when issuing the final standard. *Id.* § 60102(b)(5) ("[T]he Secretary shall . . . issue a standard . . . only upon a reasoned determination that the benefits,

---

[1]    There are two advisory committees: the Technical Pipeline Safety Standards Committee (also known as the Gas Pipeline Advisory Committee, or GPAC) and the Technical Hazardous Liquid Pipeline Safety Standards Committee. *See* 49 U.S.C. § 60102(b)(4)(A)(i); *Pipeline Advisory Committees*, PHMSA, https://perma.cc/4NNP-4Q3E (Nov. 7, 2023). GPAC is the relevant committee for the standards challenged here.

4

including safety and environmental benefits, of the intended standard justify its costs."); *see also id.* § 60102(b)(2)(D), (E).

**B.**

In August 2011, PHMSA issued an Advance Notice of Proposed Rulemaking to announce that the agency was "considering whether changes are needed to the regulations governing the safety of gas transmission pipelines." J.A. 1–3. Nearly five years later, in April 2016, PHMSA published a Notice of Proposed Rulemaking ("NPRM") that included a long list of proposed modifications to pipeline standards. In conjunction with its proposal, PHMSA published a report entitled "Preliminary Regulatory Impact Assessment," *id.* at 139, which in relevant part outlined the expected costs and benefits of the proposed standards. Members of the public — including petitioner INGAA — offered comments, and the advisory committee considered the standards and proposed some alterations.

In August 2022, PHMSA published its final rule and a report entitled "Final Regulatory Impact Analysis" ("RIA"), J.A. 619, which analyzed the costs and benefits of the final standards. INGAA petitioned for reconsideration, noting its support for the final rule generally, but asking that PHMSA "reconsider several provisions." *Id.* at 677. PHMSA largely denied that petition, with a few exceptions not relevant here.

INGAA now petitions this court for review, challenging five specific standards that were included in the final rule. The challenged standards and PHMSA's justifications for adopting them are highly technical. We thus address each standard individually and in detail *infra*, in Section III of this opinion.

5

**II.**

We have jurisdiction under 49 U.S.C. § 60119(a) to review final regulations prescribed by PHMSA. We review *de novo* whether the agency followed the procedural mandates of the APA, as well as those of the pipeline-specific statute, § 60102. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014); 49 U.S.C. § 60119(a)(3). On the merits of the final rule, we apply the familiar APA standard that requires us to determine whether the rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). But in this context, we defer to the agency's decision only if it is "informed," *GPA Midstream*, 67 F.4th at 1199, and PHMSA must make a "*reasoned* determination" that the benefits of the final standard justify the costs, 49 U.S.C. § 60102(b)(5) (emphasis added). Finally, the APA requires the agency to show that it "reasonably considered the relevant issues and reasonably explained the decision." *China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256, 264 (D.C. Cir. 2022) (cleaned up).

**III.**

**A.**

We grant INGAA's petition for review as to four standards for which PHMSA failed to make "a reasoned determination that the benefits . . . justify [the] costs." 49 U.S.C. § 60102(b)(5). We refer to these standards as the high-frequency-ERW standard, the crack-MAOP standard, the dent-safety-factor standard, and the corrosive-constituent

6

standard. We vacate each of these standards based on PHMSA's inadequate final cost-benefit analyses.[2]

### 1. High-Frequency-ERW Standard

Some pipes are manufactured through a process known as electric resistance welding ("ERW"). ERW involves forming a pipe by using an electric current to weld the edges of a piece of steel together to form a cylinder. *See Fact Sheet: Pipe Manufacturing Process*, PHMSA, https://perma.cc/JYD5-URFB (Dec. 1, 2011). Prior to 1970, this welding was achieved through the use of low-frequency currents. *Id.* But for the last several decades, the process has instead used high-frequency currents, which "produce[] a higher quality weld." *Id.*

Corrosion can lead to the thinning of pipe walls, known as "metal loss," which can cause some pipes, including those formed by ERW, to split open at the seam (that is, the point where the steel is welded together). *See Fact Sheet: Pipe Defects and Anomalies*, PHMSA, https://perma.cc/4E9E-GZWG (Dec. 1, 2011). Prior to the instant rulemaking, the regulations addressed this concern by incorporating an industry standard known as ASME/ANSI B31.8S. *See* 49 C.F.R. § 192.7(c)(6). That industry standard requires pipeline

---

[2] We thus need not opine on INGAA's other challenges to these four standards, including that PHMSA failed to offer an adequate preliminary cost-benefit analysis under 49 U.S.C. § 60102(b)(3)(B); violated the APA's logical-outgrowth doctrine; and failed to consider recommendations from the advisory committee as required by § 60102(b)(2)(G). *Cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("Because these challenges have no impact on the outcome of this appeal, we decline to address them.").

operators to immediately repair a pipe upon discovering metal loss along longitudinal seams formed by *low-frequency* ERW — but the standard does not mention pipes formed by *high-frequency* ERW. *See* ASME/ANSI B31.8S at § 7.2.1 (available at https://perma.cc/P66V-3C5K). By contrast, the final rule requires immediate repair where there is metal loss along a seam created by *either* high-frequency or low-frequency ERW, if the pipe is expected to fail at a certain pressure. *See* 49 C.F.R. §§ 192.714(d)(1)(iv), 192.933(d)(1)(iv).[3]

In justifying the final standard, PHMSA claimed that the standard "will not impose an additional cost burden on pipeline operators" because the regulations already required immediate repairs through their incorporation of ASME/ANSI B31.8S. J.A. 658–59. INGAA noted in its motion for reconsideration that the agency's reliance on ASME/ANSI B31.8S did not justify immediate repair of pipes formed by *high-frequency* ERW. INGAA therefore asked PHMSA to exclude from the rule's repair requirements any pipes formed by high-frequency ERW. But PHMSA denied the request. INGAA now challenges this standard as applied to pipes formed by high-frequency ERW.

We vacate the high-frequency-ERW standard because PHMSA's analysis of its costs is unsupported by the record. *See* 49 U.S.C. § 60102(b)(5) (requiring "a reasoned determination that the benefits . . . justify [the] costs"). The agency concluded that this standard simply "adopt[ed] requirements . . . referenced in ASME/ANSI B31.8S" and claimed that the standard therefore "will not impose an

---

[3]    The regulation also applies to seams formed by other methods — known as direct current and electric flash welding — which are not at issue here.

8

additional cost burden on pipeline operators since [the mandated repairs] are already required."  J.A. 658–59; *see* 49 C.F.R. § 192.7(c)(6) (incorporating ASME/ANSI B31.8S by reference).    But, as discussed, the pre-existing industry standard addressed seams formed by *low-frequency* ERW, but not those formed by *high-frequency* ERW.  *See* ASME/ANSI B31.8S at § 7.2.1 (available at https://perma.cc/P66V-3C5K). Contrary to the agency's assurances, the challenged standard imposes a new repair requirement with respect to high-frequency-ERW pipes.    PHMSA did not recognize this requirement as new and therefore did not consider the costs it imposed.    Thus, the agency's cost-benefit analysis is unsupported by the record and fails to demonstrate "a reasoned determination."  49 U.S.C. § 60102(b)(5); *cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983) (requiring a "rational connection between the facts found and the choice made" (cleaned up)).

On appeal, the agency argues that seams formed through high-frequency ERW face a high risk of failure.  But that argument pertains only to the standard's benefits — it supports the conclusion that the standard would reduce the risk of an accident.  Without properly identifying the costs of the new standard, "it is not apparent just how the agency went about weighing the benefits against the costs."    *GPA Midstream*, 67 F.4th at 1200.    We find unconvincing PHMSA's contention that its discussion of ASME/ANSI B31.8S was "beside the point" because the agency just "'clarif[ied] existing regulatory expectations.'"  PHMSA Br. 55–56 (alteration in original) (quoting J.A. 659).  According to the agency's contemporaneous explanation, the existing regulatory expectations were the requirements of ASME/ANSI B31.8S, which do not support the agency's claim that no new costs will be incurred by pipeline operators under the high-frequency-ERW standard.  *See Dep't of Com.*

*v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." (citations omitted)). Because the agency imposed a new safety requirement without properly addressing the costs of doing so, the standard cannot stand.[4]

## 2. Crack-MAOP Standard

Another type of anomaly in a pipeline that can potentially cause failures is a crack — *i.e.*, an opening or separation in the pipe wall. *See Pipeline Glossary: Cracks*, PHMSA, https://perma.cc/V7L8-VWKA (last visited July 31, 2024). In the NPRM, PHMSA proposed requiring immediate repair of "cracks or crack-like flaws" in certain circumstances, depending on the location of the crack, its depth, and its interaction with other cracks.

Separately, PHMSA proposed requiring operators to immediately repair *any* anomaly — crack, corrosion, dent, etc. — based on the pipeline's "predicted failure pressure"

---

[4]    As for remedy, the high-frequency-ERW standard is contained within a provision that also applies to longitudinal seams formed by other methods — "direct current, low-frequency . . . electric resistance welding, [or] electric flash welding." 49 C.F.R. §§ 192.714(d)(1)(iv), 192.933(d)(1)(iv). INGAA does not challenge the standard as applied to pipes formed by those other methods, and PHMSA's reasoning is valid as to those methods because ASME/ANSI B31.8S *did* require repairs to those types of pipes prior to the present rulemaking. *See* ASME/ANSI B31.8S at § 7.2.1 (available at https://perma.cc/P66V-3C5K). Thus, as INGAA requests, we vacate 49 C.F.R. §§ 192.714(d)(1)(iv) and 192.933(d)(1)(iv) only as applied to pipes formed by high-frequency electric resistance welding. *See GPA Midstream*, 67 F.4th at 1201–02.

10

(that is, the gas pressure at which the anomaly would cause the pipeline to burst or otherwise fail). J.A. 121. The proposed rule set the limit for the predicted failure pressure in relation to the maximum allowable operating pressure ("MAOP"). The MAOP is the maximum gas pressure at which an operator may lawfully operate a segment of a pipeline based on its material, design, and location. *See* 49 C.F.R. §§ 192.3, 192.619. The proposed standard required operators to immediately repair any anomaly when the predicted failure pressure was less than or equal to 1.1-times the MAOP — in other words, when the pipe was expected to fail if faced with a gas pressure of 110% or less of the MAOP. PHMSA noted that the proposed standard was consistent with the pre-existing standard, stating that "PHMSA is not proposing to change this criterion." J.A. 38.

But PHMSA adjusted its approach to cracks during the comment period. The final rule requires operators to immediately repair any crack or crack-like anomaly when its predicted failure pressure is less than 1.25-times the MAOP. 49 C.F.R. §§ 192.714(d)(1)(v)(C), 192.933(d)(1)(v)(C). Thus, the threshold for repairing cracks was changed and operators must repair more cracks under the final rule than they would have repaired under the proposed rule: Under the final rule, operators must repair a crack when the expected failure pressure falls below 125% of the maximum allowed pressure, rather than below 110% of the maximum. This increases the burden on operators because, for example, under the final rule operators need to repair a cracked pipe that is expected to fail if the pressure reaches 115% of the MAOP, but operators would not have been required to make that repair under either the proposed or the pre-existing standard.

To justify this change, PHMSA explained that, for cracks, it believed that the proposed 1.1-times-MAOP

**A10**

11

standard "would not provide an adequate safety margin." J.A. 587; *see also id.* ("PHMSA has determined that this safety margin for immediate crack conditions is inadequate . . . ."). In denying INGAA's petition for reconsideration as to this standard, PHMSA elaborated that the "more conservative MAOP-based threshold for immediate repair is appropriate to ensure adequate protection against crack anomaly failure for a number of reasons." *Id.* at 708–09 (footnote omitted).

We conclude that PHMSA failed to provide a reasoned final cost-benefit analysis for this standard, as required by 49 U.S.C. § 60102(b)(5). This time, the agency's reasoning fails because it neglected to analyze the costs altogether. The agency should have considered the costs of changing the predicted failure pressure at which operators would be required to repair cracks and crack-like anomalies. The change was significant — 1.1-times the MAOP was the standard for all anomalies prior to this rulemaking and was included in the proposed rule, but the agency adopted a new threshold of 1.25-times the MAOP for cracks and crack-like anomalies. Without evaluating the costs of the change, the agency could not make "a reasoned determination that the benefits . . . justify [the] costs." 49 U.S.C. § 60102(b)(5); *see GPA Midstream*, 67 F.4th at 1200.

PHMSA points to its statement in the RIA that "the final changes to § 192.933(d) addressing metal loss, stress corrosion cracking, and metal-loss affecting a detected longitudinal seam, and selective seam corrosion will not impose an additional cost burden on pipeline operators since they are already required." J.A. 658–59. But the pipe anomalies discussed in that statement include only one type of crack (stress corrosion cracking) — the statement does not address the costs of the entire crack-MAOP standard, which applies to *all* cracks and crack-like anomalies. *See* 49 C.F.R.

**A11**

12

§§ 192.714(d)(1)(v)(C), 192.933(d)(1)(v)(C).  In any event, to the extent the quoted statement from the RIA purports to apply to the crack-MAOP standard, it is inaccurate because the crack-MAOP standard did not adopt a mandate that was "already required," J.A. 659 — rather, it increased the standard from 1.1-times MAOP to 1.25-times MAOP.

PHMSA falls back on an argument that it "was not obligated to consider the impact of the [crack-MAOP standard] separate from other elements of this rulemaking." PHMSA Br. 51 (cleaned up).  Elsewhere, it similarly argues that the statute "allows PHMSA to evaluate the aggregate effects of similar, mutually reinforcing regulatory provisions." *Id.* at 35.  We need not decide today the precise extent to which the agency must particularize its cost-benefit analyses, or the extent to which it can calculate the costs and benefits of related provisions together:  Here, as explained, the agency did not calculate the costs of the final crack-MAOP standard at all.  To the extent it did address the costs, the agency claimed the standard had none because it reiterated already existing requirements, which is contrary to the record.  We therefore vacate 49 C.F.R. §§ 192.714(d)(1)(v)(C) and 192.933(d)(1)(v)(C).

### 3.  Dent-Safety-Factor Standard

The dent-safety-factor standard is one part of the agency's approach to addressing dents in pipe walls. Depending on factors such as their location and depth, dents are subject to certain repair or monitoring requirements.  For example, some dents require immediate repair, 49 C.F.R. § 192.933(d)(1)(ii), and others require repair within one year, *id.* § 192.933(d)(2)(i)–(iii).  But operators can avoid or delay these repair requirements under the final rule based on an exception:  If the operator performs an engineering analysis

13

and ensures the pipe is not at risk of failure based on a measure known as "critical strain levels," the normal dent-repair requirements do not apply. *Id.*

Section 192.712(c), which was not included in the proposed rule but was added to the final rule, spells out procedures that an operator must use as part of its engineering analysis when evaluating dents if the operator seeks to utilize the exception to the normal repair requirements. The dent-safety-factor standard is one part of these procedures and is used to measure "reassessment intervals." 49 C.F.R. § 192.712(c)(9). If the engineering analysis relieves an operator of the duty to repair a dent at a particular time, the reassessment interval dictates when an operator must reexamine that dent to see if the condition has worsened. The dent-safety-factor standard requires operators to calculate the reassessment interval using two inputs. Operators start by estimating the "fatigue life," *i.e.*, how long it would take the dent to cause the pipeline to fail. *See id.* Then, the operators divide the fatigue life by a "safety factor" — a number set to provide a margin of error to ensure that the dent is reassessed prior to failure. *See id.* The final rule requires a safety factor of five or greater, meaning that, for example, a dent with a fatigue life of ten years would need to be reassessed within a maximum of two years: ten years (fatigue life) divided by five (safety factor). *See id.*

In the comment process, INGAA supported the adoption of a fatigue-life to safety-factor ratio, like the one adopted in the final rule; but INGAA proposed a safety factor of two rather than five. That would have resulted in reassessment intervals 2.5 times greater than that required by the final rule. In other words, if the fatigue life of a dent were ten years, INGAA supported a proposal that would have required reassessment after five years, instead of the final rule's two

14

years.  After promulgating the final rule, PHMSA denied INGAA's reconsideration petition as to this standard.

We must vacate the dent-safety-factor standard because the agency failed to analyze its costs:  There is simply no discussion of the costs of this standard in the final rule or RIA.  Thus, "it is not apparent just how the agency went about weighing the benefits against the costs," and the standard cannot stand.  *See GPA Midstream*, 67 F.4th at 1200.

The agency cites only its statement in the final rule that this standard provided "an adequate safety margin" and a footnote in the final rule referencing an industry publication that recommended a safety factor between two and five.  J.A. 588.  That does little to explain why the agency adopted the top end of the range and, more importantly, does nothing to identify the *costs* of the standard.

Because we have determined that the dent-safety-factor standard, contained in 49 C.F.R. § 192.712(c)(9), is inadequately justified, we must address the parties' further dispute over the appropriate remedy.  INGAA asks us to vacate only that sub-provision, while leaving the remainder of § 192.712(c) intact.  PHMSA, on the other hand, argues that if we vacate subsection (c)(9), we must vacate all of § 192.712(c).

We agree with PHMSA.  "We will sever . . . a portion of an administrative regulation only when we can say without any substantial doubt that the agency would have adopted the severed portion on its own," such as when the provisions "operate[] entirely independently of one another."  *Am. Petrol. Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017) (cleaned up).  Here, § 192.712(c) establishes a cohesive scheme under which an operator must "evaluate dents and other mechanical damage," and its application allows an

**A14**

15

exception in circumstances where an operator otherwise would be required to more immediately repair the dent, *see* 49 C.F.R. § 192.933(d)(1)–(3). If we vacate only § 192.712(c)(9), an operator could avail itself of the exception without having to comply with the provision that "details *when* the next dent reassessment must take place."[5] Reply Br. 14 (emphasis in original). Because we have "substantial doubt that the agency would have adopted" the exception without the reassessment-interval requirement in subsection (c)(9), we conclude that it is not severable from the remainder of the provision. *Am. Petrol. Inst.*, 862 F.3d at 71 (cleaned up). We therefore vacate 49 C.F.R. § 192.712(c) in its entirety.

**4. Corrosive-Constituent Standard**

The corrosive-constituent standard is designed to require operators to monitor and prevent internal corrosion of pipeline walls. Prior to the present rulemaking, regulations focused on corrosive *gas*: They provided that pipeline operators must monitor and minimize internal corrosion "[i]f corrosive gas is being transported." 49 C.F.R. § 192.477. Corrosive gas can cause the pipeline's walls to corrode or thin, risking dangerous incidents such as ruptures. *See Pipeline Safety: Internal Corrosion in Gas Transmission Pipelines*, 65 Fed. Reg. 53,803, 53,803 (Sept. 5, 2000).

Concerned that those requirements were not specific enough, PHMSA proposed adding a new standard that would

---

[5] In such a circumstance, reassessment would instead be required in either seven or ten years, depending on the geographic location of the dent, as established by 49 C.F.R. § 192.712(h). But those timelines act as backstops and may be significantly longer than the reassessment interval calculated under § 192.712(c)(9).

16

"require monitoring for deleterious gas stream *constituents*." J.A. 92 (emphasis added) (discussing proposed 49 C.F.R. § 192.478). "Corrosive constituents," such as carbon dioxide and water, may be harmless on their own but can create corrosive gas when combined with other substances.

Commenters objected to the breadth of the proposed standard and the advisory committee proposed limiting the rule "to the transportation of corrosive *gas*," rather than corrosive *constituents*. J.A. 504 (emphasis added). In response, PHMSA narrowed its approach in the final rule: The final rule requires operators to "develop and implement a monitoring and mitigation program to mitigate the corrosive effects, *as necessary*"; it does not, like the proposed rule, expressly require operators to "identify potentially corrosive constituents in the gas being transported." *Compare* 49 C.F.R. § 192.478(a) (emphasis added) *with* J.A. 112.[6]

In justifying the final standard, PHMSA claimed that regulations promulgated by the Federal Energy Regulatory Commission already require some operators to monitor corrosive constituents, so the new standard "is not expected to add any incremental compliance activities or costs, but rather codifies existing practice into regulation." J.A. 648. At the same time, "PHMSA acknowledge[d] that while there may be

---

[6]    PHMSA asserts that the changes between the proposed and final rules sufficed to fully implement the advisory committee's recommendation that the regulation only apply where corrosive gas is present. INGAA reads the final rule differently and believes the standard imposes obligations in some circumstances where corrosive constituents, but not corrosive gas, are present. We need not resolve this dispute over the precise meaning of the rule because we vacate the standard based on PHMSA's insufficient final cost-benefit analysis.

17

compliance costs," it was difficult to precisely predict or calculate those costs. *Id.* at 650. As for benefits, the agency noted that there were nearly 150 incidents and $200 million in damages over a 12-year span caused by corrosion-related incidents. *Id.* at 652. Once again, PHMSA rejected INGAA's petition for reconsideration of this final standard.

The final cost-benefit analysis of the corrosive-constituent standard was inadequate because PHMSA's description of the costs was internally inconsistent. The agency stated first that the rule "is not expected to add any incremental compliance activities or costs," J.A. 648; and then that "while there may be compliance costs, precisely how much those compliance costs are is hard to determine," *id.* at 650. We thus cannot discern the agency's reasoning: Does the standard impose no costs at all or does it impose some costs that cannot be calculated? The agency's explanation contradicts itself and thus fails to meet the requirement of a reasoned cost-benefit analysis. *See* 49 U.S.C. § 60102(b)(5); *cf. Nat. Res. Def. Council v. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("[I]t would be arbitrary and capricious for the agency's decision making to be internally inconsistent." (cleaned up)).

PHMSA does little to reconcile this inconsistency on appeal. It restates its conflicting justifications, and claims that the second statement "did not override" the first one. PHMSA Br. 43 (quoting J.A. 648, 650). But we must rely on the agency record, which does not explain PHMSA's reasoning, so this argument is unavailing. We thus vacate 49 C.F.R. § 192.478.

**B.**

We deny INGAA's petition as to the last challenged standard, which we refer to as the pipeline-segment standard.

**A17**

18

INGAA challenges both the preliminary and final cost-benefit analyses of this standard based on a minor change in the language between the proposed and final rules. But PHMSA stated in the record that the revised wording does not implement any substantive change, and INGAA provides no reason to doubt the agency's representations. Because the language-change arguments are the only ones that INGAA preserved and because those claims are unconvincing, INGAA's challenge to the pipeline-segment standard fails.

The pipeline-segment standard addresses monitoring for "stress corrosion cracking" ("SCC"), which is a pipe anomaly that occurs when corrosion and high pressure (*i.e.*, stress) lead to cracks. *See Fact Sheet: Stress Corrosion Cracking*, PHMSA, https://perma.cc/QLP7-TPUX (July 23, 2014); *see also* J.A. 63 ("SCC is cracking induced from the combined influence of tensile stress and a corrosive medium."). One way to monitor pipelines for SCC is through "direct assessment" — *i.e.*, excavating areas around a pipeline to directly examine sample portions of the pipe and surrounding soil. The NPRM proposed requiring a minimum of three excavations per "SCC segment" when operators conduct a direct assessment. J.A. 127. The proposed rule did not define "SCC segment."

The final rule adopts the proposed standard with a minor tweak: It requires at least three excavations per "covered pipeline segment" — rather than per "SCC segment." 49 C.F.R. § 192.929(b)(3). The regulations define "covered pipeline segment" — as they did prior to the instant rulemaking — to mean "a segment of gas transmission pipeline located in a high consequence area," *id.* § 192.903, and a covered pipeline segment's "boundaries are determined by population density and other consequence factors," J.A. 582. The agency explained that "the final rule invokes certain

19

consensus industry standards" that "[m]ost operators already successfully utilize," so "the incremental cost . . . would be negligible." *Id.* at 642. As for benefits, PHMSA recognized that the standard was not expected "to result, on [its] own, in measurable changes in the risk of pipeline releases, incidents or other quantifiable benefits," but the agency pointed to the benefits of clarifying its expectations. *Id.*

In its petition for reconsideration, INGAA asserted that the change in terminology from "SCC segment" to "covered pipeline segment" could require pipeline operators to perform up to three times as many excavations. PHMSA disagreed and stated that there was no "substantive difference between the meaning of the proposed and final versions." J.A. 720.

On appeal, INGAA persists in claiming that the change in wording imposes a significant burden on pipeline operators, and that PHMSA failed to evaluate the costs and benefits of that burden in either its preliminary or final analyses. It asserts that requiring three assessments per "covered pipeline segment" instead of per "SCC segment" "tripl[es] the number of excavations" that a pipeline operator must conduct. INGAA Br. 39. But PHMSA has never defined "SCC segment," and INGAA provides no evidence other than its own representations that a single "SCC segment" could contain up to three "covered pipeline segments." To the contrary, PHMSA indicated in the record that it viewed the two terms as interchangeable. At oral argument, INGAA's counsel accepted that, if "SCC segment" and "covered pipeline segment" mean the same thing, it has no disagreement with the agency or the final rule. Accordingly, we take PHMSA at its word and interpret the final rule as substantively the same as the proposed rule with respect to the number of excavations required for a direct assessment. As a result, the parties agree to the number of

20

excavations that are mandated; and INGAA's challenges to both the preliminary and final cost-benefit analyses fall away.

To the extent INGAA mounts other attacks on the final cost-benefit analysis, such arguments are forfeited: INGAA's petition for reconsideration focused only on the language modification. Thus, INGAA cannot now argue, for example, that PHMSA failed to conduct a cost-benefit analysis for conducting a set number of excavations. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004) ("As a general rule, claims not presented to the agency may not be made for the first time to a reviewing court." (cleaned up)); 49 U.S.C. § 60119(a)(3) ("A judicial review of agency action under this section shall apply the standards of review established in [the APA].").

\*   \*   \*

For the foregoing reasons, we grant the petition in part and deny it in part. We vacate 49 C.F.R. § 192.712(c) (the dent-safety-factor standard and related provisions); 49 C.F.R. §§ 192.714(d)(1)(v)(C) and 192.933(d)(1)(v)(C) (the crack-MAOP standard); and 49 C.F.R. § 192.478 (the corrosive-constituent standard). We also vacate 49 C.F.R. §§ 192.714(d)(1)(iv) and 192.933(d)(1)(iv) (the high-frequency-ERW standard), but only as applied to seams formed by high-frequency electric resistance welding. We deny the petition as to 49 C.F.R. § 192.929(b)(3) (the pipeline-segment standard).

*So ordered.*

**A20**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    PARTIES

The following are parties in this Court:

    a. <u>Petitioner</u>: Interstate Natural Gas Association of America (INGAA).

    b. <u>Respondents</u>: United States Department of Transportation and Pipeline and Hazardous Materials Safety Administration (PHMSA).

    c. <u>Amicus Curiae for Respondent</u>: Pipeline Safety Trust.

### B.    CORPORATE DISCLOSURE STATEMENT

INGAA is an incorporated, not-for-profit trade association representing virtually all interstate natural gas pipeline companies operating in the United States. INGAA has no parent companies, subsidiaries, or affiliates that have issued publicly traded stock. Most INGAA member companies are corporations with publicly traded stock.

INGAA has 26 member companies. They are: BHE GT&S; Boardwalk Pipelines; Cheniere Energy, Inc.; DT Midstream; DTE Energy; Eastern Shore Natural Gas; Enbridge Energy; Equitrans Midstream; Iroquois Pipeline Operating Company; Kinder Morgan, Inc.; Millennium Pipeline Company, LLC; Mountain West Pipeline; National Grid; National Fuel Gas Supply Corporation; NextEra Energy; ONEOK, Inc; Pacific Gas and Electric; Sempra LNG; Southern Company Gas; Southern Star Central Gas Pipeline, Inc.; Spire, Inc.; TC Energy; Tellurian,

Inc.; The Williams Companies; UGI Energy Services, LLC; and WBI Energy Transmission, Inc.

### C. RULINGS UNDER REVIEW

INGAA seeks review of five standards contained within PHMSA's Final Rule entitled Pipeline Safety: Safety of Gas Transmission Pipelines: Repair Criteria, Integrity Management Improvements, Cathodic Protection, Management of Change, and Other Related Amendments, 87 Fed. Reg. 52,224 (Aug. 24, 2022). PHMSA issued technical corrections and responded to petitions for reconsideration in April 2023. See Pipeline Safety: Safety of Gas Transmission Pipelines: Repair Criteria, Integrity Management Improvements, Cathodic Protection, Management of Change, and Other Related Amendments; Technical Corrections; Response to Petitions for Reconsideration, 88 Fed. Reg. 24,708 (Apr. 24, 2023).

### D. RELATED CASES

Counsel is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ Sean Marotta
Sean Marotta

**A22**

**JUDGMENT ENTERED AUGUST 16, 2024**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,<br><br>       Petitioner,<br><br>  v.<br><br>PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION and U.S. DEPARTMENT OF TRANSPORTATION,<br><br>       Respondents. | No. 23-1173 |

**DECLARATION OF BEN KOCHMAN IN SUPPORT OF PANEL REHEARING**

I, Ben Kochman, declare that the following is true and correct:

1.      I am over the age of twenty-one years old and have personal knowledge of the statements made herein.

2.      I am the Director of Pipeline Safety Policy at the Interstate Natural Gas Association of America ("INGAA").

3.      INGAA is a trade association that advocates for the regulatory and legislative positions of importance to the interstate natural gas pipeline industry in North America. Its 27 member companies operate almost 200,000 miles of

interstate pipelines that transport natural gas from producers to consumers, providing critical energy needed to heat our homes, cook our food, fuel our factories, and generate electricity. Natural gas is a domestically produced, affordable, and foundational fuel source that the U.S. will rely on for decades to come, and pipelines are the safest, most reliable, and most affordable way to deliver natural gas to consumers and end users. Approximately one-third of the energy consumed in the U.S. travels through natural gas infrastructure.

4.    Pipeline safety is INGAA's and our members' greatest priority.

5.    I have worked at INGAA since 2021, and my responsibilities include advocating for federal pipeline safety policies, laws, and regulations that support the development and operation of safe, reliable, and environmentally-sound interstate natural gas transportation and storage infrastructure.

6.    Part of this advocacy includes working with our member companies to analyze, understand, and file comments on regulatory proposals and final rules promulgated by the Pipeline Hazardous and Materials Safety Administration ("PHMSA"). This includes the regulation at issue here, *Pipeline Safety: Safety of Gas Transmission Pipelines: Repair Criteria, Integrity Management Improvements, Cathodic Protection, Management of Change, and Other Related Amendments* ("RIN 2"), which PHMSA began to enforce on February 24, 2024.

7.      The final rule included hundreds of new or revised pipeline safety standards. INGAA agreed with the vast majority of the regulatory changes but challenged five regulations before this court, including 49 C.F.R. § 192.712(c)(9), "Analysis of predicted failure pressure and critical strain level, dents and other material damage."  The subsection of the regulation, which INGAA challenged, reads:

> **(9)** Using operational pressure data, a valid fatigue life prediction model that is appropriate for the **pipeline** segment, and assuming a reassessment safety factor of 5 or greater for the assessment interval, estimate the fatigue life of the dent by Finite Element Analysis or other analytical technique that is technically appropriate for dent assessment and reassessment intervals in accordance with this section. Multiple dent or other fatigue models must be used for the **evaluation** as a part of the **engineering critical assessment**.

8.      INGAA only objected to the subsection of Section 192.712(c) related to the reassessment safety factor, Section 192.712(c)(9), which dictates how often a gas transmission pipeline operator must assess a gas transmission pipeline for dents.  But the Court determined that Section 192.712(c)(9) was inseverable from Section 192.712(c) and vacated all of Section 192.712(c).

9.      This Court's vacatur of all of Section 192.712(c) implicates two other regulations which were not part of this litigation but reference Section 192.712(c)— Sections 192.714(d)(1)-(3)  and 192.933(d)(1)-(3).  The references to Section 192.712(c) in these other sections refer to operators' obligations to make

repairs to dents with metal loss "unless engineering analyses performed in accordance with § 192.712(c) demonstrate critical strain levels are not exceeded."

10.    It is our understanding that absent remand without vacatur, PHMSA may implement the Court's vacatur of Section 192.712(c) by striking the words, "unless an engineering analysis performed in accordance with § 192.712(c) demonstrates critical strain levels are not exceeded" in Sections 192.714(d)(1)-(3) and 192.933(d)(1)-(3).  INGAA has attempted to advocate for a narrower implementation that strikes only the words "performed in accordance with § 192.712(c)," but PHMSA has declined to meet with INGAA and has declined to give guidance to operators on how it plans to implement this Court's vacatur.

11.    Since this Court's judgment, INGAA heard from its member companies and other regulated entities that were not part of this litigation and represented by other trade associations but will be bound by this Court's decision about the effects of striking the entire phrase "unless an engineering analysis performed in accordance with § 192.712(c) demonstrates critical strain levels are not exceeded" in Sections 192.714(d)(1)-(3)  and 192.933(d)(1)-(3). This approach means not only that PHMSA-regulated pipeline operators will no longer be able to prepare and file with PHMSA an "engineering critical assessment" which identifies and evaluates when potential anomalies or defects do not require an

immediate or near-term repair,[1] but that PHMSA-regulated pipeline operators will no longer be able to prepare and file an engineering assessment of *any kind* to defer immediate and/or near-term repairs of otherwise covered dents.

12.     INGAA members never envisioned that PHMSA would remove the phrase "engineering analysis," as it is a long-standing phrase that has been applied to repairs of dents in pipe located in High Consequence Areas—areas with the greatest population—in Section 192.933(d)(3) since the promulgation of the original gas-transmission-integrity-management rule on December 15, 2003 (68 Fed. Reg. 69824).

13.     Because they did not anticipate that PHMSA would potentially eliminate all engineering analyses from its dent regulations, INGAA members, as well as other non-member transmission gas pipeline owners, did not fully appreciate the disturbance to land, cost, and potential environmental impacts that will occur if Section 192.712(c) is vacated in its entirety, rather than just Section 192.712(c)(9).

14.     On September 20, 2024, the American Gas Association and the American Petroleum Institute, non-parties to the litigation, sent a letter to PHMSA

---

[1] "Near-term" is used to indicate a one-year repair condition for High Consequence Areas—areas with the greatest population—under Section 192.933(d)(2)(i)-(iii) and two-year repair condition outside of High Consequence Areas under Section 192.714(d)(2)(i)-(iii).

Deputy Administrator Tristan Brown expressing concern regarding the removal of not only the ability to perform engineering critical analyses in Section 192.712(c) but also the potential loss of the ability to perform "engineering analyses" in the other two regulations which reference Section 192.712(c). A copy of that letter is attached as Exhibit A. AGA and API explained that, "[s]hould PHMSA elect to disallow 'engineering analyses' in general, it would create considerable difficulty in thoughtfully prioritizing repairs and maintain gas deliverability, with little if any benefit to public safety as operators expend additional resources to making repairs on piping that can be shown (through engineering analysis) to not be a threat."

15.     Other parts of PHMSA's updated regulations, which INGAA did not challenge and in fact supported, substantially increase the amount of mileage that pipeline operators must examine to look for dents with metal loss. There are now approximately 180,000 miles of pipelines that now require immediate repairs of dents with metal loss. That is 13 times the mileage previously required to be inspected.

16.     If Section 192.712(c) was removed in its entirety, and PHMSA, in implementing the Court's decision decided to remove the ability of operators to use scientifically-proven "engineering analyses" from Sections 192.714 and 192.933, it would have immediate and significant consequences to pipeline operators, landowners, and land disturbance without increasing pipeline safety.

17.    If PHMSA implemented this Court's vacatur by disallowing "engineering analyses" in general, it would create considerable difficulty for operators to thoughtfully prioritize repairs and maintain gas deliverability, with little if any benefit to public safety because operators will expend additional resources on making repairs on piping that can be shown—through engineering analysis—to not be harmful. If a pipeline operator must make an immediate repair once it detects potential dents with metal loss through one of its inspection tools, it will need to either reduce gas throughput or completely stop gas throughput on the section of the pipeline near the repair, even during high-demand periods when homes and businesses are most reliant on natural gas to heat or air condition their homes or when utilities count on natural gas to generate electricity to meet peak demand.

18.    The number of required pipeline excavations will increase dramatically if operators cannot demonstrate to PHMSA through engineering analyses that the dents are actually not injurious and therefore do not require immediate or near-term repairs.  INGAA surveyed its members to see the impact of repairing dents without an engineering-critical-analysis exception; sampled members estimated that they collectively will need to perform up to 572 digs a year, costing $85.8 million, to repair .

19.     In many cases, pipeline operators will need to excavate land near or next to landowners' homes to repair all dents with metal loss, even when the vast majority of those found have no immediate or near-term safety impact.  This will disturb rights-of-way and inconvenience landowners and their neighbors on or near the right-of-way through increased truck traffic entering and leaving the right-of-way and increase noise during the repairs.  This could, in turn, negatively affect operator-landowner relations.

20.     The repair work could also disturb wildlife, vegetation and plants, as a pipeline operator restores the pipeline right-of-way to as near pre-construction condition as possible.  If such repairs are under or through waterbodies—pipelines sometimes route under or through streams, rivers, and other water crossings—there could be additional impacts to waterbodies and fisheries that would be avoided if the pipeline could demonstrate through an engineering critical analysis that an immediate or near-term repair is unnecessary for safety reasons.

21.     Pipeline operators typically will repair dents through construction techniques that avoid methane emissions.  But, for a small minority of repairs, there will be "blowdowns"—an intentional venting of natural gas to evacuate gas from the repair area—when these construction techniques cannot be used. With longer repair windows, or the ability to defer repairs through an engineering

analysis, a pipeline operator would be better able to avoid or minimize these methane emissions.

22.     Operators could be forced to spend hundreds of millions on repairs for anomalies representing minimal risks to pipeline safety, taking away both financial and personnel resources from higher safety priorities.  The expenses of unnecessary repairs could also divert spending away from other capital projects that would modernize pipeline facilities, increase pipeline reliability and resilience, reduce methane emissions from pipeline facilities, or perform lower-priority, voluntary pipeline safety repairs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15, 2024, in Washington, D.C.

_____
Ben Kochman

# EXHIBIT A

September 20, 2024

Mr. Tristan Brown
Deputy Administrator
Pipeline and Hazardous Materials Safety Administration
(PHMSA)
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

**Re: *Interstate Natural Gas Association of America (INGAA) v. Pipeline and Hazardous Materials Safety Administration (PHMSA) and United States Department of Transportation*, No. 23-1173 (D.C. Cir. 2024)**

Dear Deputy Administrator Brown:

The American Gas Association (AGA)[1] and the American Petroleum Institute (API)[2] (collectively, the Associations) respectfully urge the Pipeline and Hazardous Materials Safety Administration (PHMSA or the Agency) to appropriately implement the recent decision in *INGAA v. PHMSA,* No. 23-1173 (D.C. Cir. 2024) where the United States Court of Appeals for the District of Columbia Circuit (the Court) vacated several standards issued in PHMSA's final rule entitled Pipeline Safety: Safety of Gas Transmission Pipelines: Repair Criteria, Integrity Management Improvements, Cathodic Protection, Management of Change, and Other Related Amendments, 87 Fed. Reg. 52,224 (August 24, 2022) (RIN 2).

In light of the Court's August 16, 2024 decision to vacate several provisions promulgated in RIN 2, the Associations wish to identify several significant concerns regarding the vacatur of 49 C.F.R. § 192.712(c). Since the Associations were not part of this litigation, we urge the practical implementation of the Court's decision, which we discuss below.

There are several other sections of the regulations that reference § 192.712(c) but were not part of the litigation. Namely, § 192.712(c) is referenced in §§ 192.714(d)(1)-(3) and 192.933(d)(1)-(3). All the references to § 192.712(c) in these sections refer to prescriptive scenarios where operators must make repairs to dents with metal loss, "unless engineering analyses performed in accordance with § 192.712(c) demonstrate critical strain levels are not exceeded."

---

[1] Founded in 1918, AGA represents more than 200 local energy companies committed to the safe and reliable delivery of clean natural gas to more than 180 million Americans. AGA is an advocate for natural gas utility companies and their customers and provides a broad range of programs and services for member natural gas pipelines, marketers, gatherers, international natural gas companies, and industry associates. Today, natural gas meets more than one third of the United States' energy needs.

[2] API is the national trade association representing all facets of the oil and natural gas industry, which supports 10.3 million U.S. jobs and 8 percent of the U.S. economy. API's nearly 600 members include large integrated companies, as well as exploration and production, refining, marketing, pipeline, and marine businesses, and service and supply firms. They provide most of the nation's energy and are backed by a growing grassroots movement of millions of Americans.

It is important to note that the Engineering Critical Assessment (ECA), as described in § 192.712(c), is but one of several methods of engineering analyses. Moreover, PHMSA has recognized the term "engineering analyses" has existed in its regulations (e.g., § 192.933) long before RIN 2 was promulgated and ECA was defined. Therefore, in complying with the Court's order to vacate § 192.712(c), PHMSA should update its regulations in a manner that preserves the availability of "engineering analyses" to demonstrate that critical strain levels are not exceeded. Specifically, the Associations recommend the following:

> "…unless engineering analyses performed ~~in accordance with § 192.712(c)~~ demonstrate critical strain levels are not exceeded."

This solution would preserve the ability for operators to utilize scientifically-proven methods governed by engineering analyses to mitigate threats, just as they have done prior to RIN 2's promulgation.

Should PHMSA elect to disallow "engineering analyses" in general, it would create considerable difficulty in thoughtfully prioritizing repairs and maintain gas deliverability, with little if any benefit to public safety as operators expend additional resources to making repairs on piping that can be shown (through engineering analysis) to not be a threat.

One of the primary objectives of RIN 2 was to allow for modern in-line inspection (ILI) technologies to better mitigate safety threats, including for detection of dents with metal loss. This is in contrast to legacy ILI technologies, which necessitated a conservative approach to repairing dents with metal loss. More recent advancements in ILI technology have allowed operators to more accurately and appropriately determine which dents with metal loss represent safety threats requiring repair. The continued use of "engineering analyses" will allow operators to be precise in how repairs are identified and prioritized, leading to more thoughtful and sophisticated approaches to pipeline safety, not only in high-consequence areas (HCAs) but across transmission pipeline systems more broadly.

In summary, the following effects could occur should PHMSA disallow the use of "engineering analyses" in §§ 192.714(d) and 192.933(d):

1. Operators who have identified dents with metal loss found after February 24, 2024, and are prepared to demonstrate that critical strain levels are not exceeded through ECA, could be out of compliance with PHMSA's updated regulations.
2. Operators may end up excavating and repairing all dents with metal loss, even when the vast majority of those found have no immediate or near-term safety impact. Each excavation could result in otherwise unnecessary methane emissions. Excavations could result in disruption to landowners, as well as impairing gas deliverability.
3. Operators could be disincentivized from investing in the most advanced ILI technologies that help pinpoint dents with metal loss.
4. Operators could be forced to spend hundreds of millions of dollars on repairs for anomalies representing minimal risks to pipeline safety, taking away resources from higher safety priorities.

**A34**

The Associations remain hopeful that PHMSA will choose to implement the Court's decision with our concerns raised above in mind. We are available to discuss these important safety issues at your convenience as you work on complying with the Court's decision.

Thank you for your consideration of this letter.

Respectfully submitted,

Alan M. Chichester
Managing Director
Safety, Operations, & Engineering
American Gas Association
400 North Capitol Street, NW
Washington, D.C. 20001
achichester@aga.org

Dave Murk
Senior Director, Pipelines
Midstream and Industry Operations
American Petroleum Institute
200 Massachusetts Avenue, N.W.
Suite 1100
Washington, D.C. 20001
murkd@api.org

cc:     Alan Mayberry, Associate Administrator (via email)
        John Gale, Director of Standards and Rulemaking (via email)

**A35**

## CERTIFICATE OF SERVICE

I certify that on October 15, 2024, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Sean Marotta
Sean Marotta